**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**



RECEIVED

APR 1 1 2022

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

JEFFREY WALKER, LISA
WALKER, H.W., JEFFREY WHITE,
CHRISTA WHITE, and C.W.,

     *Plaintiffs*,

v.

STEVE MARSHALL, in his official
capacity as Attorney General of the
State of Alabama, BRIAN C.T.
JONES, in his official capacity as
District Attorney for Limestone
County, and JESSICA VENTIERE, in
her official capacity as District
Attorney for Lee County,

     *Defendants*.

CIVIL ACTION NO. 2:22-cv-167-ECM-SMD

Claim of Unconstitutionality

**COMPLAINT FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

   Plaintiffs, by and through their attorneys, bring this Complaint against the

above-named Defendants, their employees, agents, and successors in office, and in

support thereof state the following:

**INTRODUCTION**

   1.  In the final hours of the 2022 legislative session, Alabama passed S.B.

184 (attached hereto as Exhibit A). This felony ban on health care, referred to herein

1

as the felony health care ban, categorically bars transgender minors from receiving medical care to affirm their gender identity, including to treat gender dysphoria.

2.     Specifically, the felony health care ban makes it a felony to "engage in or cause" certain enumerated forms of medical care if the care is provided for "the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's biological sex as defined in [the law]."  S.B. 184, § 4(a).

3.     The felony health care ban criminalizes the provision of this medical treatment even when the minor, the minor's parents, and the minor's medical providers all agree that the care is medically necessary and in the minor's best interest.

4.     The medical care criminalized by Alabama has been recognized as safe and effective by the American Medical Association, the American Academy of Pediatrics, the Endocrine Society, the American Psychological Association, and every other leading relevant professional medical association.

5.     The law is so broad that doctors, nurses, parents, clergy members, teachers, guidance counselors, and perhaps even transgender youth themselves are subject to criminal penalty—as is anyone else who could conceivably be said to "cause" a transgender minor to receive medical care that affirms their gender identity.

6.     Because the felony health care ban singles out and discriminates against

2

.

transgender youth based on their transgender status and sex, including sex stereotypes, the State must show that it substantially serves at least an exceedingly persuasive government interest to comply with the Equal Protection Clause. It cannot do so.

7.      Instead of protecting transgender youth, the felony health care ban endangers them by making it a felony to provide them with medical care necessary to treat their gender dysphoria, a serious medical condition characterized by clinically significant distress resulting from the lack of congruence between a person's gender identity and their sex assigned at birth. Without treatment, young people with gender dysphoria often suffer extreme distress, anxiety, depression, and suicidal ideation. The State's alleged concern for public health and the ability to provide informed consent is misguided and pretextual.

8.      The medical treatments targeted by the law are safe and effective. And according to standard medical practice, these treatments are provided only after a medical provider has undertaken an individualized assessment of the minor's needs and discussed the treatment options available to the patient, and only after the minor, the minor's parents, and the minor's medical providers all agree that the treatment at issue is the most appropriate course of treatment.

9.      The felony health care ban is contrary to the legislature's previous recognition of "the sanctity of the physician/patient relationship" and "that a duly licensed physician should be allowed to prescribe any FDA approved medication for

any condition that the physician and patient agree would be beneficial for treatment of the patient without interference by government or private parties." S. J. Res. 82, Act. No. 2021-251 (Ala. Apr. 13, 2021).

10.    If allowed to go into effect, the felony health care ban will have dire physical, emotional, and psychological consequences for transgender youth, who will be kept from receiving necessary medical care.  It will render parents powerless to help and make medical decisions for their own adolescent children, forcing them to watch as their children suffer from the extreme distress caused by gender dysphoria.  It will force medical professionals to violate the tenets of their profession and abandon their patients.

11.    None of these consequences need or should occur because the felony health care ban is unconstitutional in multiple respects and therefore should be enjoined.

## JURISDICTION AND VENUE

12.    This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution.

13.    This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 and Article III of the United States Constitution.

14.    Venue is proper in the Middle District of Alabama under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events or omissions giving rise

to Plaintiffs' claims occurred in the District and because Defendants Marshall and Ventiere, who are sued in their official capacities, carry out their official duties at offices located in this District.

15.     The Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§2201 and 2202.

16.     This Court has personal jurisdiction over Defendants because they are domiciled in Alabama and because their denial of Plaintiffs' rights under the United States Constitution occurred within Alabama.

## PLAINTIFFS

17.     Plaintiffs Jeffrey ("Jeff") Walker, Lisa Walker, and H.W. live in Auburn, Alabama.  Jeff and Lisa are the parents of H.W., who is a 15-year-old girl.  H.W. is transgender and currently receives medical care targeted by the felony health care ban. The Walker family, including 20-year-old son Robert, are pictured here:



18.     Plaintiffs Jeffrey ("Jeff") White, Christa White, and C.W. live in Limestone County, Alabama.  Jeff and Christa are the parents of C.W., who is a thirteen-year-old girl.  C.W. is transgender and currently receives medical care targeted by the felony health care ban.  The White family is pictured here:



## DEFENDANTS

19.     Defendant Steve Marshall is the Attorney General of the State of Alabama, located at 501 Washington Avenue, Montgomery, Alabama.     The Attorney General may, at "any time he [] sees proper, . . . superintend and direct the prosecution of any criminal case in any of the courts of this state," Ala. Code § 36-15-14, and may also "direct any district attorney to aid and assist in the investigation or prosecution of any case in which the state is interested," *id.* at § 36-15-15.  As such, Defendant Marshall is responsible for criminal enforcement of S.B. 184. Defendant Marshall is sued in his official capacity.

20.     Defendant Brian C.T. Jones is District Attorney for Limestone County, located at 200 W Washington St., Athens, Alabama.  District attorneys have the power to "draw up all indictments and to prosecute all indictable offenses" within

their jurisdiction.   Ala. Code § 12-17-184(2).   As such, Defendant Jones is responsible for criminal enforcement of S.B. 184 in Limestone County.  Defendant Jones is sued in his official capacity.

21.    Defendant Jessica Ventiere is District Attorney Pro Tem for Lee County, located at 2311 Gateway Dr. #111, Opelika, AL.  District attorneys have the power to "draw up all indictments and to prosecute all indictable offenses" within their jurisdiction. Ala. Code § 12-17-184(2).  As such, Defendant Ventiere is responsible for criminal enforcement of S.B. 184 in Lee County.  Defendant Ventiere is sued in her official capacity.

**FACTUAL ALLEGATIONS**

**Standards of Care for Treating Transgender Youth**

22.    "Gender identity" is a person's internal, innate sense of belonging to a particular sex.

23.    There is a significant biological component underlying gender identity.

24.    Everyone has a gender identity.

25.    An individual's gender identity cannot be changed by external factors.

26.    A person's gender identity usually matches the sex they were designated at birth based on their external genitalia. The terms "sex designated at birth" or "sex assigned at birth" are more precise than the term "biological sex" because all of the physiological aspects of a person's sex are not always aligned with each other as

typically male or typically female.  For these reasons the Endocrine Society cautions that the terms "biological sex" and "biological male or female" are imprecise and should be avoided.

27.     Most boys are designated male at birth based on their external genital anatomy and have a male gender identity, and most girls are designated female at birth based on their external genital anatomy and have a female gender identity. But transgender people have a gender identity that differs from the sex assigned to them at birth. A transgender boy is someone who was assigned a female sex at birth but has a male gender identity. A transgender girl is someone who was assigned a male sex at birth but has a female gender identity.  This lack of alignment between gender identity and sex assigned at birth experienced by transgender individuals can cause significant distress.

28.     Some transgender people first experience this lack of alignment early in childhood. For others, the onset of puberty, and the resulting physical changes in their bodies, may lead them to recognize that their gender identity does not align with their sex assigned at birth.

29.     According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM-V"), "Gender Dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity

and the sex assigned to them at birth. In order to be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.

30.     Being transgender is not a condition to be cured. But gender dysphoria is a serious medical condition that, if left untreated, can result in debilitating anxiety, severe depression, self-harm, and suicidality.

31.     The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published widely accepted clinical guidelines for treating gender dysphoria. The medical treatment for gender dysphoria seeks to eliminate the clinically significant distress created by gender dysphoria by helping transgender people live in alignment with their gender identity. This treatment is sometimes referred to as "gender transition," "transition related care," or "gender affirming care." The American Academy of Pediatrics agrees that this care is safe, effective, and medically necessary treatment for the health and wellbeing of children and adolescents suffering from gender dysphoria.

32.     The precise treatment for gender dysphoria depends on each person's individualized needs, and the medical standards of care differ depending on whether the treatment is for a pre-pubertal child, an adolescent (i.e., minors who have entered puberty), or an adult.

10

33.     Before puberty, treatment does not include any pharmaceutical or surgical intervention and is limited to "social transition," which means allowing a transgender child to live and express themselves in ways consistent with their gender identity.

34.     As transgender youth reach puberty, puberty delaying therapy may become medically necessary and appropriate under the Endocrine Society's clinical practice guidelines.

35.     For many transgender adolescents, going through puberty in accordance with the sex assigned to them at birth can cause extreme distress.  Puberty delaying hormone treatment (also referred to as puberty blockers or puberty suppressing treatment) allows transgender youth to avoid going through endogenous puberty, along with the heightened gender dysphoria and permanent physical changes that puberty would cause.  In providing puberty delaying therapy, pediatric endocrinologists work in close consultation with qualified mental health professionals experienced in diagnosing and treatment gender dysphoria.

36.     Puberty delaying treatment works by pausing puberty at the stage it has reached when the treatment begins. This has the impact of limiting the influence of a person's endogenous hormones on the body. For example, after the initiation of puberty delaying treatment and for the duration of the treatment, a transgender girl

will experience none of the impacts of testosterone that would be typical if she underwent her full endogenous puberty.

37.   Under the Endocrine Society's clinical guidelines, transgender adolescents may be eligible for puberty-blocking hormone therapy if:

- A qualified mental health professional has confirmed that:

  o   the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria (whether suppressed or expressed);

  o   gender dysphoria worsened with the onset of puberty; and

  o   any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment,

- The adolescent:

  o   has sufficient mental capacity to give informed consent to this (reversible) treatment;

  o   has been informed of the effects and side effects of treatment (including potential loss of fertility if the individual subsequently continues with hormone treatment) and options to preserve

12

fertility; and

     o    has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process,

- And a pediatric endocrinologist or other clinician experienced in pubertal assessment:

     o    agrees with the indication for GnRH agonist (puberty blocking) treatment,

     o    has confirmed that puberty has started in the adolescent, and

     o    has confirmed that there are no medical contraindications to GnRH agonist treatment.

38.    Additionally, for some transgender adolescents, it may be medically necessary and appropriate to provide hormone therapy to initiate puberty consistent with gender identity.  Evaluation for this treatment generally occurs starting around age 14.

39.    Under the Endocrine Society's clinical guidelines, transgender adolescents may be eligible for gender-affirming hormone therapy if:

- A qualified mental health professional has confirmed:

13

- o     the persistence of gender dysphoria;

- o     any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start hormone treatment; and

- o     the adolescent has sufficient mental capacity to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to this (partly) irreversible treatment,

- And the adolescent:

  - o     has been informed of the (irreversible) effects and side effects of treatment (including potential loss of fertility and options to preserve fertility); and

  - o     has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process,

- And a pediatric endocrinologist or other clinician experienced in pubertal

14

induction:

- o   agrees with the indication for sex hormone treatment; and

- o   has confirmed that there are no medical contraindications to sex hormone treatment.

40.    Transgender adolescents who receive hormone therapy after puberty blockers do not go through puberty in accordance with the sex assigned to them at birth but instead go through puberty that matches their gender identity.

41.    For many transgender patients, social transition and hormone therapy adequately manage gender dysphoria. Others may also need one or more forms of surgical treatment.

42.    Under WPATH's clinical guidelines, adolescents who are transgender may receive medically necessary chest reconstructive surgeries prior to the age of majority if they have severe gender dysphoria, provided they have been living consistent with their gender identity for a significant period of time. If medically indicated, treatment for gender dysphoria may include genital surgery after a patient reaches the age of majority.

43.    Medical care that allows a transgender youth to avoid going through puberty that does not align with their gender identity and that provides gender-affirming hormones can be lifesaving and can eliminate or reduce the need for surgery later in life.  These treatments improve short- and long-term health outcomes for

15

transgender youth.

44.    Puberty blockers and hormone therapy are safe and effective.

### Legislative History and Text of S.B. 184

45.    S.B. 184 was introduced in the Alabama Senate on February 3, 2022 by Senator Shay Shelnutt.

46.    The operative portion, replicated below, is as follows:

Section 4.

(a) Except as provided in subsection (b), no person shall engage in or cause any of the following practices to be performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this act:

   (1) Prescribing or administering puberty blocking medication to stop or delay normal puberty.

   (2) Prescribing or administering supraphysiologic doses of testosterone or other androgens to females.

   (3) Prescribing or administering supraphysiologic doses of estrogen to males.

   (4) Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.

   (5) Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's sex, including metoidioplasty, phalloplasty, and vaginoplasty.

   (6) Removing any healthy or non-diseased body part or tissue, except for a male circumcision.

16

(b) Subsection (a) does not apply to a procedure undertaken to treat a minor born with a medically verifiable disorder of sex development, including either of the following:

(1) An individual born with external biological sex characteristics that are irresolvably ambiguous, including an individual born with 46 XX chromosomes with virilization, 46 XY chromosomes with under virilization, or having both ovarian and testicular tissue.

(2) An individual whom a physician has otherwise diagnosed with a disorder of sexual development, in which the physician has determined through genetic or biochemical testing that the person does not have normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action for a male or female.

47.     A parallel bill was introduced in the House as H.B. 266 by Representative Wes Allen.

48.     A violation of S.B. 184 is a Class C felony, punishable by 1 to 10 years in prison and a fine of up to $15,000. *See* Ala. Crim. Code §§ 13-A-5-6(a)(3), 13A-5-11(a)(3).

49.     After S.B. 184 was introduced, it was referred to the Senate Healthcare Committee, which held a public hearing on February 9, 2022.[1] During the hearing, parents and physicians of transgender youth testified in opposition to the bill, explaining that the decision to undergo gender-affirming hormone treatment is a

---

[1]     Senate     Healthcare     Comm.     Meeting     (Feb.     9,     2022), https://vimeo.com/675565353/99cfbd4ffe.

years-long process involving the minor, the minor's parents, and the team of physicians

monitoring the care plan, and that genital surgery is never performed on minor children

as part of gender-affirming care in Alabama.   Five opponents of the bill testified,

whereas only one proponent of the bill testified.

50.     Testifying against the bill, Plaintiff Jeffrey White spoke to "advocat[e]

for [his] daughter," C.W., who is transgender, and would be "forced into psychological

desolation by th[e] bill."  Mr. White harshly criticized the bill as "dehumaniz[ing]" his

daughter:

> This irresponsible action is the final link in a long chain of
> dehumanizations she has endured on a regular basis for years.  Her
> identity is repeatedly denigrated by the ignorant and hateful.  Her dignity
> is damaged every time she is mistreated for being herself.  Now even her
> liberty will be denied by this egregious overreach into her life.  This bill
> is not about compassion or protection.  It is a violation and subjugation
> of who my daughter is.  My daughter is much like her peers.  She loves
> to draw, hang out with her cats, and play games . . . . She is one of the
> kindest and most creative people I am privileged to know.  Her success
> is possible because the treatment she receives allows her to focus on
> having a normal childhood.  This bill forces her onto a difficult path rife
> with risk and despair.  The light shining brightly in her eyes will dim, as
> all she cares about is overtaken by a formerly treatable incongruence that
> you will have rendered intractable.  The bill renders us powerless by
> violating our rights as parents to make medical decisions about our child.
> . . . . Vote no on this extremist bill before it kills someone.

51.     Testifying against the bill, Monroe Smith—who is transgender and a

student at the Alabama School of Fine Arts—explained that his and his parents' joint

decision to pursue medical care affirming his gender identity was not made "at the drop

of a hat," but was deliberate, careful, and preceded by a "steady process of

18

communication between [Mr. Smith], [his] parents, [his] doctors, and mental health professionals, all for the purpose of making sure that we were informed and ready to pursue this long journey ahead." Mr. Smith testified that "[o]nly after many dialogues and evaluations to determine my physical and emotional readiness, my family and I and our team of doctors finally began the process of my medical transition," and that "[n]ot once in this process did I nor my parents ever feel like we faced pressure to receive this necessary and life-saving medical service that I needed." Mr. Smith cautioned that if he "was denied the option of gender-affirming care," he "would not be the successful young man [he is] today," and that he is a "living, breathing example among so many other youth across Alabama" that this care "saves lives."

52.     Testifying against the bill, Doctor Nola Jean Ernest—a community pediatrician in Alabama with a medical degree and a PhD in neurobiology who treats many patients with gender dysphoria, and who is the Vice President of the Alabama Academy of Pediatrics—pointed out that the alleged justifications for S.B. 184 distorted or misrepresented existing science and medicine. Disputing the Act's presumption that gender-affirming care is "experimental," Dr. Ernest explained that "we know the use of medication for gender dysphoria under the guidance of a medical team is an evidence-based standard of care." Dr. Ernest testified that her team of gender experts "have dedicated their lives and careers" to treating patients with gender dysphoria, which is "vitally important, because transgender patients, on order of about

86% of them will . . . think about suicide.  And over half of them will attempt it." Criminalizing gender-affirming medical care, Dr. Ernest continued, would not only "override doctors" and "interfere[] in the parent-doctor and patient-doctor relationship," but deny transgender children "lifesaving" medical treatment.

53.     Testifying against the bill, Reverend David Chatel—a priest at St. Peter's Episcopal Church in Alabama—expressed his "deep[] concern[] with the content and potential impact of S.B. 184."  Rev. Chatel pleaded with the Senators to recognize that "transgender youth and their families have a right to supportive and affirming healthcare that respects their dignity and their privacy."  To "deny them this," Rev. Chatel explained, is "cruel."

54.     As the sole proponent testifying in favor of the bill, Patrick Lappert—a plastic surgeon—compared gender dysphoria in transgender children to a child saying to a doctor, "I self-identify as an Olympic athlete, I need anabolic steroids."

55.     S.B. 184 passed the full Senate on February 23, 2022.  During the Senate floor debate, Senator Shelnutt—the bill's sponsor—characterized gender-affirming medical care as "child abuse":  "We don't want parents to be abusing their children. We don't want to make that an option, because that's what it is; it's child abuse."[2]

56.     That same day, February 23, 2022, the House Judiciary Committee held

---

[2] Kiara Alfonseca, *Alabama Governor Signs 'Don't Say Gay,' Trans Care, and Bathroom Ban Bills*, ABC News (Apr. 8, 2022), https://abcn.ws/35VXWFe.

an extensive public hearing on S.B. 184's companion bill, H.B. 266.

57.     Opponents of H.B. 266 noted that puberty-blocking medications are both reversible and potentially lifesaving and that genital surgeries are never performed on transgender minors in Alabama to treat gender dysphoria.   Dr. Ernest, who also testified against the felony health care ban in the Senate, testified that puberty-blocking medications are also used to treat precocious puberty (i.e., to treat conditions other than gender dysphoria) and have been in use for over thirty years.  She further testified that "studies show that if you invalidate the experiences of youth, that will increase their risk of self-harm."  She asked the legislators:  "Please do not take hope away from Alabama children."[3]

58.     Members of the House Judiciary Committee spoke out strongly against H.B. 266.  Representative Christopher England said that "[t]he legislature has no place in this discussion."  Calling for deference to the rights of parents, he added, "I don't want to put myself in a position to restrict a parent's ability to do what's best for their child."[4]

59.     Other opponents of H.B. 266 criticized the bill's broad scope, noting that

_____

[3] Savanna Tryens-Fernandes, *Lawmakers Again Consider Alabama Bill to Limit Treatments for Transgender Children*, Ala. News (Feb. 23, 2022), https://www.al.com/news/2022/02/lawmakers-again-consider-alabama-bill-to-limit-healthcare-treatments-for-transgender-children.html.

[4] *Id.*

it criminalized a broad range of doctors, nurses, and medical providers for prescribing, referring, or even dispensing medications.

60.     One week later, on March 2, 2022, the House Judiciary Committee held another hearing on H.B. 266.[5]  At the conclusion of the hearing, the Committee gave a favorable report on H.B. 266 and sent it to the full House.

61.     During the March 2, 2022 House Judiciary Committee hearing, Representative Allen compared gender-affirming medical care to "vaping," "dealing with cigarettes," and "dealing with drinking."

62.     Representative Allen also received questions from Representative England.  Representative England asked whether Representative Allen envisioned a scenario in which "the parent may be required to testify against the person that's providing some care to their child" in a criminal case.  Representative Allen responded that that was a "good question[]," but that he was "not learning in the law [sic]" enough to answer.  Representative Allen added that, in his view, gender-affirming medical care is "child abuse."

63.     On the very last day of the legislative session, April 7, 2022, the House passed S.B. 184.[6]

_____

[5]     House    Judiciary    Committee    Meeting    (Mar.    2,    2022), https://vimeo.com/683940881/4edaeefda2.

[6] House Session (Apr. 7, 2022), https://vimeo.com/697000650/59a642f5d4.

64.     Governor Ivey signed S.B. 184 into law on April 8, 2022.  By its own

terms, the law is scheduled to take effect 30 days from signing, on May 8, 2022.  In a

statement released contemporaneous with signing the law, Governor Ivey stated: "I

believe very strongly that if the Good Lord made you a boy, you are a boy, and if He

made you a girl, you are a girl . . . . [L]et us all focus on helping them to properly

develop into the adults God intended them to be."[7]

65.     On the same day the House passed S.B. 184, the House passed another

bill restricting basic rights and opportunities for transgender youth, H.B. 322.  That bill

requires children in public K-12 schools to use bathrooms, changing rooms, and locker

rooms based on the sex "as stated on the individual's original birth certificate."  That

bill also prohibits—as a result of an amendment added just before its passage—

classroom discussion of sexual orientation or gender identity in grades K-5.

66.     Governor Ivey signed H.B. 322 into law on April 8, 2022—the same day

that Governor Ivey signed S.B. 184.  H.B. 322 is scheduled to take effect on July 1,

2022.

67.     The 2022 legislative session was not the first time that Alabama's

Legislature restricted the rights of transgender youth.  Both Senator Shelnutt and

Representative Allen introduced anti-transgender bills similar to S.B. 184 in

_____

[7] Alfonseca, *supra* note 2.

23

2021:  S.B. 10 and H.B. 1, respectively.

68.     Around the same time that H.B. 1 was introduced in 2021, the House also introduced H.B. 391, a bill banning transgender young women and girls from playing on athletic teams consistent with their gender identity.  H.B. 391 was signed into law on April 20, 2021.

69.     Over the last few years, hundreds of bills that would restrict the rights of transgender people have been introduced across the country each year.  In July 2021, a federal court in Arkansas blocked an Arkansas law prohibiting health care professionals from providing transgender young people with gender-affirming care.[8] In February 2022, Texas Governor Greg Abbott issued a formal letter directing that gender-affirming medical treatment is "child abuse" under Texas law and ordering the Texas Department of Family and Protective Services to investigate (and punish) parents and guardians who support the clinically supervised and prescribed medical

---

[8] *Brandt v. Rutledge*, 21 Civ. 450, Dkt. 59 (C.D. Ark. July 21, 2021); *see also Brandt v. Rutledge*, 551 F. Supp. 3d 883 (E.D. Ark. 2021).  The same day, a federal court in West Virginia blocked a West Virginia law prohibiting girls who are transgender from participating in school sports.  *B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347 (S.D.W. Va. 2021).  A federal court in Idaho had previously blocked a similar law prohibiting girls who are transgender from participating in school sports in Idaho.  *See Hecox v. Little*, 479 F. Supp. 3d 930, 975 (D. Idaho 2020).

transition of their minor children.[9]   A Texas state court temporarily enjoined Governor Abbott's order.[10]   Like S.B. 184, the crux of these bills and policies is to exclude transgender youth from participating in society consistent with their gender identity and/or to prevent them from accessing necessary (and frequently lifesaving) medical care.

### The Legislative Findings in S.B. 184 Do Not Support the Felony Health Care Ban, Which Treats Healthcare for Transgender Youth Differently from Every Other Type of Pediatric Medicine Under Alabama Law

70.     Without any legitimate justification, the felony health care ban denies transgender youth the same types of medically necessary treatments provided to non-transgender youth.

71.     Far from fulfilling its stated purpose of protecting the physical and mental health of transgender youth, the felony health care ban endangers it.

72.     The forms of medical care criminalized by Alabama are safe, effective, and medically necessary for the health and wellbeing of children and adolescents suffering from gender dysphoria and are recognized as such by the American Medical Association, the American Academy of Pediatrics, and every other leading

---

[9] Letter from Gov. Greg Abbott to Tex. Dep't of Fam. and Protective Servs. (Feb. 22, 2022), https://s3.documentcloud.org/documents/21272649/abbott-letter-to-masters.pdf.

[10] *Doe v. Abbott*, No. D-1-GN-22-000977, 2022 WL 628912, at *1 (Tex. Dist., 353rd Judicial Dist., Mar. 02, 2022).

relevant professional medical association in the United States.

73.     Without treatment, many people with gender dysphoria suffer extreme distress and elevated rates of anxiety, depression, and suicidal ideation.

74.     The felony health care ban not only prospectively criminalizes evidence-based medical care but also requires the withdrawal of treatment from transgender minors already receiving it.  Withdrawing hormone blockers can result in extreme distress for adolescent patients who are relying on the treatment to prevent irreversible changes to their bodies from puberty.

75.     In addition to the severe and potentially deadly mental health consequences of cutting off this treatment, abruptly withdrawing hormone treatment can also result in a range of serious physiological health consequences, including hot flashes, headache, fatigue, and cardiac effects.

76.     The felony health care ban does not protect transgender minors from "unproven treatments."  Puberty blockers and hormone therapy have repeatedly been recognized by doctors and every leading relevant professional medical association as safe and effective treatments supported by evidence.

77.     Puberty blockers are also safely and consistently used with adolescents and adults undergoing chemotherapy, as well as youth experiencing precocious puberty, and hormone therapy is used for patients with Turner syndrome, Klinefelter syndrome, and hypogonadism (inability to secrete sex steroids) such as primary

ovarian insufficiency.

78.     The felony health care ban's legislative findings misleadingly assert that the use of puberty blockers to treat transgender children is "experimental" and suggest that because the treatment is "not FDA-approved" for treating gender dysphoria it is unsafe or untested. But this treatment is not experimental and FDA approval is not required for all uses of a medication; once the FDA has approved a medication for one indication, as is the case with the medications at issue here, prescribers are generally free to prescribe it for other indications.

79.     The legislative findings also incorrectly assert that providing puberty blockers should be criminalized because such treatment is "unproven" and "poorly studied," terms the felony health care ban does not define. But puberty blockers have been provided to minors—transgender or not—for decades, and the gender-affirming medical care of adolescents has been supported by multiple, prospective observational trials.

80.     If by "unproven" and "poorly studied" the Alabama legislature means a lack of randomized trials, then the legislature's criticism would apply to much of pediatric medicine, including treatments that the law expressly permits.

81.     There are no randomized trials regarding administration of puberty blockers to treat precocious puberty in cisgender children. Yet Alabama law permits this treatment, which is not covered by the felony health care ban because it is not

27

performed for the purpose of affirming a gender identity different from a minor's sex assigned at birth.

82.    The felony health care ban also categorically forecloses gender-affirming care even when the minor patient and their parents provide informed consent and the treating physician agrees the treatment is in the minor patient's best interest. For any other type of medical care in Alabama (except abortion), parents can consent to treatment on their children's behalf, and minors can consent to treatment on their own once they turn fourteen. Ala. Code § 22-8-4.

83.    The Endocrine Society's clinical guidelines for treating gender dysphoria incorporate extensive screening protocols that are consistent with general ethical principles of informed consent and shared decision-making. The guidelines extensively discuss the potential benefits, risks, and alternatives to treatment and its recommendations regarding the timing of interventions are based in part on the treatment's potential risks and the adolescent's decision-making capacity. The guidelines recommend that informed consent for pubertal blockers and hormone therapy include a discussion of all potential side effects of treatment, including the potential implications for fertility and options for fertility preservation, and require that informed consent be obtained from both the adolescent and the parents.

84.    Gender-affirming chest surgery is the only surgery generally indicated for minors under current guidelines, and it is only provided when medically

indicated.  Minors in Alabama are permitted to undergo many comparable surgeries, such as those for gynecomastia, pectus excavatum or carinatum, and breast reconstruction, all of which carry risks.  Though the risks are comparable, Alabama's felony health care ban prohibits this care for transgender adolescents alone.

85.     The felony health care ban also expressly allows doctors to perform irreversible surgeries on infants and children to change the appearance of their genitals and secondary sex characteristics when the purpose is not to affirm the gender of the individual where their gender differs from their assignment sex; in other words, when the minor is not transgender.  For example, the felony health care ban prohibits "[r]emoving any healthy or non-diseased body part or tissue" if the purpose is to provide gender-affirming care, but expressly allows such removal if the purpose is for "male circumcision," regardless of whether the minor is at an age capable of meaningfully participating in the medical decision.  S.B. 184 § 4(a)(6).  Similarly, the felony health care ban expressly permits doctors to perform irreversible surgeries to change the appearance of genitals and secondary sex characteristics on infants and children with intersex conditions or differences of sex development at ages when they are unable to meaningfully participate in medical decision making.  *Id.* §§ 4(b)(1)-(2).

86.     The felony health care ban defines a person's "sex" as the "biological state of being female or male, based on the individual's sex organs, chromosomes,

29

and endogenous hormone profiles." The felony health care ban's legislative findings likewise claim that the "sex of a person is the biological state of being female or male, based on sex organs, chromosomes, and endogenous hormone profiles, and is genetically encoded into a person at the moment of conception, and it cannot be changed." But this definition of sex is not accurate as a matter of law or medicine.

87.     In addition to being scientifically inaccurate and imprecise, the felony health care ban's definition and understanding of "sex" as something that is immutable contradicts its usage in other Alabama statutes. In Alabama Code § 22-9A-19(d), for example, which lays out the procedure for individuals to change the sex marker on their birth certificate, the law states that:

> [u]pon receipt of a certified copy of an order of a court of competent jurisdiction indicating that the sex of an individual born in this state has been changed by surgical procedure and that the name of the individual has been changed, the certificate of birth of the individual shall be amended as prescribed by rules to reflect the changes.

### The Felony Health Care Ban Is Harmful

88.     Withholding pubertal suppression and hormone therapy from transgender young people when it is medically indicated can be extremely harmful.

89.     If a clinician is forced to immediately stop pubertal suppression as a result of a criminal prohibition on the care, it will cause patients to immediately resume their endogenous puberty. This could result in extreme distress for patients who have been relying on the suppression to prevent bodily changes that come with

their endogenous puberty. These changes can be extremely distressing for a young person who had been experiencing gender dysphoria that was then relieved by medical treatment.

90.     Additionally, bodily changes resulting from puberty, such as stature, hair growth, genital growth, and voice and breast development, can be impossible or difficult to counteract even with subsequent hormone therapy and surgery, thus exacerbating lifelong gender dysphoria in patients who would have this treatment withheld or cut off.

91.     Abruptly withdrawing hormone treatment can result in a range of serious physiological and mental health consequences, including depressed mood, hot flashes, headaches, and cardiac effects. The abrupt withdrawal of treatment may also result in predictable and negative mental health consequences including heightened anxiety, depression, and suicidal ideation.

92.     The American Medical Association has denounced similar laws as "dangerous governmental intrusion into the practice of medicine" and "detrimental to the health of transgender children across the country."[11] So have numerous other major medical organizations.

_____

[11] James L. Madara, Letter to National Governors Association, American Medical Association (Apr. 26, 2011), https://bit.ly/3Kz7jJY.

93.     The passage in Arkansas of a bill similar to S.B. 184 increased emergency room visits for attempted suicide in transgender youth.  Calls to crisis lines from transgender people notably increase when bills preventing transgender youth from accessing medical care pass.

### The Felony Health Care Ban Criminalizes and Chills a Wide Range of Conduct

94.     Section 4 of the felony health care ban makes it a Class C felony for any *"person"* to *"cause"* a minor to engage in an enumerated "practice" "if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in [S.B. 184]" (emphases added).

95.     Section 3 of the felony health care ban defines "person" to include "[a]ny individual," "[a]ny agent, employee, official, or contractor of any legal entity," or "[a]ny agent, employee, official, or contractor of a school district or the state or any of its political subdivisions or agencies."  This broad definition reaches, among others, parents, doctors, nurses, teachers, guidance counselors, clergy members, and even minor patients themselves.

96.     Section 3 does not define the word "cause."  Parents who drive their children to a doctor's appointment out of state, secretaries who check patients in to a clinic, friends who talk with a child about their chosen course of treatment, and

32

many others will all be confused and left wondering whether they will be charged with a felony.

### The Felony Health Care Ban Irreparably Harms Plaintiffs

97.     The felony health care ban will impose grave harm on transgender youth, their parents, and their medical providers.

98.     The felony health care ban will deny transgender youth life-saving medical care, including puberty blockers and hormone therapy.  Without access to this care, they will suffer irreparable physical, emotional, and psychological harms.  Importantly, they will be forced to experience physical changes from a puberty that conflicts with their gender identity.  Those changes to their bodies can cause extreme distress, depression, anxiety, and suicidal ideation.

99.     The felony health care ban also conveys the State's moral disapproval of transgender youth for being transgender.

100.   The felony health care ban will render parents of transgender youth powerless to help their own children, lest they risk imprisonment.  Parents will be forced to make agonizing choices between leaving their homes, families, and friends to move out of state or depriving their children of medically necessary health care essential to their well-being.

Plaintiffs Jeff Walker, Lisa Walker, and H.W.

101. Plaintiff H.W. is a 15-year-old girl who is transgender. H.W. always felt like a girl. She came out to her parents as a girl when she was ten years old. She began her social transition soon after, and adopted the name H., began using female pronouns, bought typically female clothing, and began growing her hair long. H.W. obtained a court order changing her name, which is now reflected in her Social Security records and birth certificate.

102. Those changes were very helpful to H.W., but she remained terrified about what would happen when she started puberty, as she could not imagine having a body like a teenage boy.

103. At the recommendation of H.W.'s pediatrician, H.W.'s parents—Plaintiffs Jeff and Lisa Walker—sought out medical care for H.W. at the University of Alabama at Birmingham's Gender Health Clinic (the "Clinic"). H.W.'s care team includes several physicians and a psychologist.

104. H.W. and her parents met with five doctors during their initial visit to the Clinic. H.W. also was evaluated by a psychologist.

105. After those assessments, H.W. was diagnosed with gender dysphoria. She was eleven years old and had not yet begun puberty.

106. At age twelve, H.W.'s medical team concluded that pubertal suppression was medically indicated and, following consultation with and informed

34

consent from H.W. and her parents, H.W. began puberty-suppressing medication. This treatment has prevented H.W. from having to undergo a puberty that would cause changes in her body—some irreversible—that would severely exacerbate her gender dysphoria.  By allowing H.W. to pause puberty and not experience the physical changes that terrified her, puberty-suppressing medication has significantly improved H.W.'s health.

107.   H.W.'s doctor recently recommended that she begin taking a prescribed limited dose of estrogen in conjunction with her puberty-suppressing medication. That recommendation was made only after H.W. met her doctor's requirement that an outside therapist conduct no fewer than five counseling sessions with H.W.  The outside therapist agreed with the doctor's assessment that H.W. should begin hormone treatment.  She will begin taking estrogen in fall 2022 and over time will discontinue pubertal suppression and maintain her hormone therapy as medically indicated.

108.   For each stage of treatment, H.W.'s doctors discussed all the potential side effects with H.W. and her parents and closely monitored H.W.  H.W. and her parents agreed that the benefits of treatment significantly outweighed any risks.

109.   Growing up in a body that did not match who she was made H.W. miserable.  Before she began receiving medical care to affirm her gender identity, H.W. experienced severe gender dysphoria, depression, and anxiety.

110.   Accessing medical care has been transformative for H.W.  She became less shy and more confident and began thriving in school.

111.   The prospect of losing access to gender-affirming medical care because of the felony health care ban causes H.W. and her parents severe anxiety.  Without H.W.'s puberty-suppressing medication, she would be forced to undergo a typical male puberty, which would cause her to develop a deep voice, a typically masculine jawline, an Adam's apple, hair growth on her body, and a broadening of her shoulders.  Those changes are potentially irreversible and inconsistent with H.W.'s female gender identity.  Going through masculinizing puberty would cause H.W. to experience severe gender dysphoria, depression, and anxiety.  She would not feel like herself anymore.

112.   H.W. and her parents further worry that being forced to undergo a masculinizing puberty would invite bullying at school.  H.W. experienced such significant bullying after coming out as transgender that she had to leave school and complete her entire sixth grade year in an alternative online school, which caused her grades to suffer.  She has since thrived in school, and she and her parents fear that the felony health care ban will reverse her progress and force her back into a place of profound suffering.

113.   If the felony health care ban goes into effect, Jeff, Lisa, and H.W. may be forced to leave Alabama—and thus leave behind Jeff's job, their relatives and

friends, and H.W.'s school community and medical care team.  And critically, it would require Jeff, Lisa, and H.W. to move away from H.W.'s brother Robert, who cannot leave the state because he has a six-year commitment to the Alabama National Guard that he must honor.

Plaintiffs Jeff, Christa, and C.W. White

114.   Plaintiff C.W. White is a thirteen-year-old girl who is transgender.

115.   When C.W. was approximately nine years old, her parents, Plaintiffs Jeff and Christa White, observed that she was experiencing significant stress and anxiety.  She often had stomach aches, did not want to go to school, and would cry easily over small day-to-day things.

116.   Around that time, C.W. began speaking about her female gender identity but struggled to articulate her feelings.  Christa and Jeff thought that C.W. was experiencing gender dysphoria.  Christa discussed the meaning of the word "transgender" with C.W. and it clicked for C.W.  She said she knew that word fit for her.  After being able to name her feelings, her stress and anxiety began to diminish.

117.   C.W. requested that her family use she/her pronouns and call her "C.W."  She later shared her gender identity, new name, and she/her pronouns with her extended family.  Her stress and anxiety continued to diminish, and her mood, outlook, demeanor, and overall well-being immediately improved.

37

118.   When C.W. began fourth grade in fall 2018, she asked her friends, teachers, and other people at her elementary school to use her new name and pronouns.  She experienced a few incidents of harassment, which were immediately addressed by the school administration.  She was harassed again in fifth grade and sixth grade.

119.   In 2019, Jeff and Christa helped C.W. change her legal name through the county court and submitted the paperwork to her elementary school.

120.   In March 2019, C.W. began receiving care at the University of Alabama at Birmingham's Gender Health Clinic, where she was seen by a team of doctors including a pediatric endocrinologist and a child psychologist.

121.   C.W. was diagnosed with gender dysphoria in 2019, when she was eleven years old.

122.   In September 2019, C.W.'s care team determined that C.W. had started puberty.  Because of her longstanding dysphoria and the distress she felt about her body changing, her care team spoke to C.W. and her parents about the possibility of pubertal suppression, explained the treatment and its side effects, and ultimately recommended that she begin taking puberty blockers to delay her endogenous puberty.  They advised C.W. that this treatment could be discontinued at any time as warranted.  C.W. and her parents decided that it was in C.W.'s best interest to proceed with puberty-suppressing treatment.  C.W. has been taking the medication

and having regular check-in appointments and blood tests with her care team since then.

123.   Puberty-suppressing medication has made an incredible difference in C.W.'s life, health, and happiness.  It diminished the intense gender dysphoria that she would otherwise experience if she were to go through a puberty that does not correspond to her gender identity.  Some of the irreversible changes to her body that "masculinizing" puberty would cause would severely exacerbate her gender dysphoria and attendant symptoms.

124.   The felony health care ban would force C.W. to stop her gender-affirming medical care, which would be devastating to her mental health and put her at risk of significant harassment at school.  C.W.'s parents are concerned that without her medical treatment, C.W.'s confident self would fade away.  To avoid these devastating impacts, C.W. and her parents would have to seriously consider uprooting their family and moving out of Alabama, leaving behind their family, friends, and support networks, as well as Jeff's job and Christa's volunteer work.

## CLAIM FOR RELIEF

### COUNT ONE

Violation of Equal Protection
U.S. Const. Amend. XIV
(Brought by Minor Plaintiffs)

125.   Plaintiffs incorporate the allegations set forth above as fully set forth herein.

126.   The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

127.   The felony health care ban violates the equal protection rights of transgender minors, who are denied the same types of medically necessary treatments provided to other youth.

128.   The statute is subject to heightened scrutiny under the Equal Protection Clause because it discriminates based on: (1) transgender status and (2) sex, including non-conformity with sex stereotypes.

129.   Transgender status is at least a quasi-suspect classification because transgender people (1) have historically suffered discrimination, (2) possess a defining characteristic that bears no relation to their ability to contribute to society,

(3) exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group, and (4) are a politically powerless minority.

130.   By predicating the statute's application on whether a minor's gender identity is different from their sex assigned at birth, the felony health care ban purposefully and expressly discriminates based on transgender status.  Because the felony health care ban singles out and discriminates against transgender people, the statute triggers at least heightened scrutiny.

131.   The felony health care ban also triggers heightened scrutiny because it discriminates based on sex.

132.   Discriminating on the basis of transgender status is necessarily sex discrimination.

133.   The felony health care ban treats similarly situated people differently based on their sex assigned at birth, which is sex discrimination.

134.   The felony health care ban also discriminates based on sex by penalizing transgender minors for not conforming to sex stereotypes.

135.   The felony health care ban cannot survive heightened scrutiny because it impermissibly seeks to establish a government preference for sex stereotypes in conformity with sex assigned at birth, while criminally sanctioning a departure from stereotypes associated with a person's sex assigned at birth.

41

136.   Alabama's asserted governmental interests in protecting minors does not and cannot justify singling out gender-affirming medical care when provided to transgender youth for different treatment, much less a criminal ban.

137.   The felony health care ban is not substantially related to a governmental interest in protecting minors' health.

138.   The felony health care ban is not substantially related to a governmental interest in protecting minors' health from unproven treatments.

139.   The felony health care ban is not substantially related to an important governmental interest in protecting minors' ability to give informed consent.

140.   The felony health care ban cannot survive even rational basis review because it draws irrational and arbitrary distinctions.

141.   The felony health care ban cannot survive even rational basis review because it expresses government disapproval of transgender persons.

142.   Defendants are acting under color of state law and are liable for their violation of Plaintiffs' Fourteenth Amendment rights under 42 U.S.C. § 1983. Plaintiffs face a credible threat of enforcement.

**COUNT TWO**

Violation of Fundamental Right to Parental Autonomy
Due Process Clause
U.S. Const. Amend. XIV
(Brought by Parent Plaintiffs)

143.   Plaintiffs incorporate the allegations set forth above as fully set forth herein.

144.   The Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

145.   That fundamental right of parental autonomy includes the right of parents to seek and follow medical advice to protect the health and well-being of their children.

146.   Parents' fundamental right to seek and follow medical advice is at its apogee when the parents, their minor child, and that child's doctor all agree on an appropriate course of medical treatment.

147.   The felony health care ban's prohibition against well-accepted medical treatments for adolescents with gender dysphoria is directly at odds with parents' fundamental right to make decisions concerning the care of their children. The felony health care ban strips Alabama parents of the right to obtain medical care for their children.

148.   The felony health care ban does nothing to protect the health or well-being of minors.  To the contrary, it gravely threatens the health and well-being of

43

adolescents with gender dysphoria by denying their parents the ability to obtain lifesaving care for them.

149.   The felony health care ban's prohibition on the provision of medically accepted treatments for adolescents with gender dysphoria is not narrowly tailored to serve a compelling state interest; nor is it rationally related to any legitimate government interest.

150.   The felony health care ban's extraordinary infringement on Plaintiffs' parental autonomy cannot be justified under strict scrutiny or any standard of scrutiny.

151.   The Due Process Clause of the Fourteenth Amendment is enforceable pursuant to 42 U.S.C. § 1983.

152.   Defendants are acting under color of state law and are liable for their violation of Plaintiffs' Fourteenth Amendment rights under 42 U.S.C. § 1983. Plaintiffs face a credible threat of enforcement.  They are entitled to a declaratory judgment and injunctive relief.

**COUNT THREE**

Void for Vagueness
Due Process Clause
U.S. Const. Amends. I, XIV
(Brought by Minor and Parent Plaintiffs)

153.   Plaintiffs incorporate the allegations set forth above as fully set forth herein.

44

154.   The felony health care ban is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.  The felony health care ban makes it impossible for an ordinary person to know if and to what extent any particular conduct "causes" a minor to seek proscribed treatment.  It gives prosecutors near unfettered ability to bring felony charges at their prerogative against any "person" who, even indirectly, supports a transgender minor in receiving gender-affirming medical care.

155.   The Fourteenth Amendment is enforceable pursuant to 42 U.S.C. § 1983.

156.   Defendants are acting under color of state law and are liable for their violation of Plaintiffs' Fourteenth Amendment right under 42 U.S.C. § 1983. Plaintiffs face a credible threat of enforcement.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request this Court:

A.   Enter a judgment declaring that:

a. S.B. 184 violates the Equal Protection Clause of the Fourteenth Amendment;

b. S.B. 184 violates the fundamental right to parental autonomy protected by the Due Process Clause of the Fourteenth Amendment;

    c. S.B. 184 is void for vagueness under the Due Process Clause of the

        Fourteenth Amendment;

B.    Temporarily restrain and issue a preliminary and permanent injunction,

    restraining Defendants, their employees, agents, and successors in

    office from enforcing S.B. 184;

C.    Award Plaintiffs nominal damages of one dollar, as well as their costs

    and expenses, including reasonable attorneys' fees pursuant to 42

    U.S.C. § 1988; and

D.    Grant any additional relief as may be just and proper.

Dated: April 11, 2022

Respectfully submitted,

/s/ LaTisha Gotell Faulks

L. Nowlin-Sohl* (WA Bar No. 51512)
Malita Picasso* (NY Bar No. 5750013)
Chase Strangio* (NY Bar No. 4879466)
James D. Esseks* (NY Bar No. 2643807)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
lnowlin-sohl@aclu.org

LaTisha Gotell Faulks (ASB-1279-I63J)
Kaitlin Welborn* (DC Bar No. 88187724)
AMERICAN CIVIL LIBERTIES UNION OF ALABAMA FOUNDATION
P.O. Box 6179
Montgomery, AL 36106
Phone: (334) 265-2754
tgfaulks@aclualabama.org

46

Carl Charles* (GA Bar No. 5427026)
Tara Borelli* (GA Bar No. 265084)
LAMBDA LEGAL
158 West Ponce De Leon Ave.,
Suite 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti J. Swaminathan* (NY Bar No. 5598792)
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Lynly S. Egyes* (NY Bar No. 4838025)
Milo Inglehart* (NY Bar No. 5817937)
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Phone: (510) 587-9696
lynly@transgenderlawcenter.org

Dale Melchert* (NY Bar No. 5366554)
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696, ext. 354
dale@transgenderlawcenter.org

Kathleen R. Hartnett* (CA Bar No. 314267)
Julie Veroff* (CA Bar No. 310161)
Zoë W. Helstrom* (CA Bar No. 339093)
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Andrew Barr* (CO Bar No. 49644)
COOLEY LLP
1144 15th Street, Suite 2300
Denver, CO 80202
Phone: (720) 566-4121
abarr@cooley.com

Adam Katz* (MA Bar No. 706834)
Elizabeth Reinhardt* (MA Bar No. 707645)
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116
Phone: (617) 937-2305
ereinhardt@cooley.com

Katelyn Kang* (NY Bar No. 5745799)
Valeria M. Pelet del Toro* (NY Bar No. 5764667)
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Phone: (212) 479-6849
kkang@cooley.com

Robby L.R. Saldaña* (DC Bar No.
1034981)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
Phone: (202) 842-7800
rsaldana@cooley.com

*Pro Hac Vice Applications
Forthcoming

Attorneys for Plaintiffs